## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 26 2018, 8:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jesse R. Harper
Harper & Harper, LLC
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Patricia C. McMath
Deputies Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kathleen Strohbach, <br> *Appellant-Petitioner,* <br><br> v. <br><br> Indiana Department of Child Services, <br> *Appellee-Respondent.* | September 26, 2018 <br><br> Court of Appeals Case No. 18A-MI-1018 <br><br> Appeal from the Porter Circuit Court <br><br> The Honorable Mary R. Harper, Judge <br><br> The Honorable Gwenn R. Rinkenberger, Magistrate <br><br> The Honorable Stephanie Wicke, Judge Pro Tem <br><br> Trial Court Cause No. 64C01-1707-MI-7313 |

**Sharpnack, Senior Judge.**

# Statement of the Case

In November 2010, the Department of Child Services of Porter County (DCS) recorded a substantiated report of child neglect by Kathleen Strohbach. In July 2017, Strohbach filed in the Porter Circuit Court a petition to expunge the substantiated report. The court denied her petition, and she appeals. We reverse and remand with instructions to the court to grant the petition and to order expungement of the substantiated report.

# Issue

Strohbach presents one issue for our review, which we restate as: whether the court erred by denying the petition to expunge.

# Facts and Procedural History

In October 2010, Strohbach was involved in an altercation with her ex-husband's girlfriend, and Strohbach's then nine-year-old son witnessed the incident. As a result of this event, criminal charges were filed against Strohbach, and she ultimately pleaded guilty to one count of disorderly conduct as a Class B misdemeanor. In addition, DCS substantiated a report of child neglect against Strohbach because, although her son was not struck or involved in the altercation, he was present.

# Discussion and Decision

Strohbach contends the court erred by denying her petition to expunge the substantiated report of child neglect because she presented clear and convincing

evidence that satisfied the requirements of Indiana Code section 31-33-27-5 (2012).

[5] Indiana Code section 31-33-27-5 provides, in pertinent part:

> ....
>
> (b) An individual identified as a perpetrator of child abuse or neglect in a substantiated report may file a petition with a court exercising juvenile jurisdiction in the county in which the individual resides, requesting that the court order the department to expunge the substantiated report and related information.
>
> ....
>
> (e) In considering whether to grant a petition filed under this section, the court may review:
>
>> (1) the factors listed in IC 31-39-8-3[1] in relation to the petitioner, if the substantiated report was the subject of a juvenile court case; and

---

[1] Indiana Code section 31-39-8-3 (2017) provides, in relevant part:

(e) In considering whether to grant the petition, the juvenile court may review:
(1) the best interests of the child;
(2) the age of the person during the person's contact with the juvenile court or law enforcement agency;
(3) the nature of any allegations;
(4) whether there was an informal adjustment or an adjudication;
(5) the disposition of the case;
(6) the manner in which the person participated in any court ordered or supervised services;
(7) the time during which the person has been without contact with the juvenile court or with any law enforcement agency;
(8) whether the person acquired a criminal record; and
(9) the person's current status.

> (2) any facts relating to the petitioner's current status,
> activities, employment, contacts with children, or other
> circumstances relevant to consideration of whether the
> petition should be granted.

> (f) The court may grant the petition if the court finds, by clear
> and convincing evidence, that:

>> (1) there is little likelihood that the petitioner will be a
>> future perpetrator of child abuse or neglect; and

>> (2) the information has insufficient current probative value
>> to justify its retention in records of the department for
>> future reference.

[6] Strohbach's burden of proof is by clear and convincing evidence. *See* Ind. Code § 31-33-27-5(f). In reviewing a judgment requiring proof by clear and convincing evidence, we may not impose our own view as to whether the evidence is clear and convincing. *In re Guardianship of B.H.*, 770 N.E.2d 283, 288 (Ind. 2002). Rather, we must determine, by considering only the probative evidence and reasonable inferences supporting the judgment and without weighing evidence or assessing witness credibility, whether a reasonable trier of fact could conclude that the judgment was supported by clear and convincing evidence. *Id.*

[7] DCS did not file an appellee's brief. In fact, it filed with this Court its intent not to file a brief, noting that it took no position as to Strohbach's petition to expunge and that it stood silent at the hearings thereon. Where an appellee does not file a brief, we do not undertake to develop arguments on that party's

behalf; rather, we may reverse upon a prima facie showing of reversible error by the appellant. *Morton v. Ivacic*, 898 N.E.2d 1196, 1199 (Ind. 2008). Prima facie error is error "at first sight, on first appearance, or on the face of it." *Front Row Motors, LLC v. Jones*, 5 N.E.3d 753, 758 (Ind. 2014). This "prima facie error rule" relieves this Court from the burden of controverting arguments advanced for reversal, a duty which remains with the appellee. *Simek v. Nolan*, 64 N.E.3d 1237, 1241 (Ind. Ct. App. 2016).

[8]     At the expungement hearings, Strohbach testified that she took her then nine-year-old son with her to her ex-husband's apartment to discuss with him an issue regarding their son. The issue was that their son had told her that he did not want to stay at his father's house because, when there, he could hear his father and his girlfriend having sex. The girlfriend of Strohbach's ex-husband was at the apartment when Strohbach and her son arrived. Strohbach testified that her ex-husband grabbed her by the arms, and she broke free and attempted to find his girlfriend so that they could all discuss the matter. Strohbach went to the bedroom where the girlfriend slammed the door in her face, and she and Strohbach ended up in a physical altercation. Strohbach testified that as a result of this incident, she pleaded guilty to disorderly conduct. Her verified petition further detailed that she was sentenced to six months of probation on this charge, which she successfully completed, including the payment of all fines and fees.

[9]     Strohbach additionally testified that, besides the criminal charges, a substantiated report of child neglect was filed against her because the altercation

occurred in the presence of her young son. She testified that the services she underwent for the DCS case included random drug screens, individual therapy, and family therapy with her son. Although DCS neither opposed Strohbach's petition nor participated in the hearing in any meaningful way, it confirmed to the court that Strohbach participated in individual and family therapy. DCS informed the court that Strohbach completed all services and that the wardship was dismissed and the case closed as a successful reunification in December 2011. DCS also noted for the court that at the time the case was closed, Strohbach's son was doing well academically, that his needs were being met by his parents, and that DCS had no concern with his safety while in his parents' care.

[10] Strohbach further testified that she has joint physical and legal custody of her son. She also acknowledged in her testimony that prior to and subsequent to this incident she has not been the subject of any other child abuse or neglect allegations or any other criminal charges. Additionally, Strohbach's counsel informed the court that she had successfully petitioned to have the misdemeanor disorderly conduct conviction expunged from the record.

[11] Strohbach acknowledged that, at the time of the incident, she was employed at DCS. However, she testified for the past three years she had been employed with Wexford Health working at the DOC as a parole reentry liaison. She also testified that she had begun courses to obtain her masters degree in social work. In her testimony, she explained that her current internship dealt with adults but

that her next internship might require her to work with children and families, and a substantiated DCS report might keep her from doing that.

[12] In addition to her own testimony, Strohbach presented the testimony of three women, all of whom had known her for at least eight years and have children in their homes under their care. One of the witnesses worked with Strohbach at DCS and still works there. She testified that she has no concerns whatsoever regarding Strohbach's behavior with children and that she does not believe Strohbach would be at risk of committing child neglect or abuse in any fashion in the future. The second witness testified that she was acquainted with Strohbach through their sons' football team and that she has never been worried or in fear for Strohbach to be around her children, even without her present. She further testified that Strohbach had never shown any signs of being at risk of child abuse or neglect; instead, Strohbach had always been caring and willing to take care of the kids. Similarly, the third witness testified that she was acquainted with Strohbach through their sons' football team. She characterized Strohbach's behavior around children as "very loving and very caring." Tr. p. 14. She also acknowledged that she had never been worried or in fear for Strohbach to be around her children, even without her present.

[13] At the second expungement hearing, the court explained that it had obtained the DCS report concerning the substantiation of neglect. There was mention in the report that Strohbach had been diagnosed as being bipolar, and the court questioned Strohbach about this diagnosis. Strohbach stated that she had been diagnosed during her marriage and that she had been treated with medication

and mental health services. She further explained, "[A]fter I separated and was, um, away from my ex-husband, my now ex-husband, for a substantial period of time, a lot of the manifestations started to subside because I was no longer in a very dysfunctional, abusive relationship. Um, over time [the doctor] weaned me off of my medication and closed my case. I've been medication free for several years now." *Id.* at 26-27. She also reported to the court that she had experienced no further problems of that sort.

[14] In denying Strohbach's petition, the trial court found, in pertinent part:

> 4) That a Substantiated report was issued on November 4, 2010. The report showed that Petitioner attacked Father's girlfriend and they got into a fight. The report also revealed that she has Bi-Polar Type II disorder and denied she was not taking her medications. The prescriptions reviewed by the caseworker showed that she was taking her medication. Petitioner also revealed she was released from therapy in August 2010. From the report, it appears there may have been Domestic Abuse in the relationship, Father against Mother.
>
> ….
>
> 9) Petitioner provided no evidence that she is addressing her Bi-Polar Type II disorder, and she claimed she was dismissed from therapy prior to the substantiated incident. She has not provided any proof other tha[n] what she testified, that she was released. She was taking her medication at the time of the incident and claims that the doctor weaned her off her meds and closed her case.
>
> ….

11) This Court finds, that there is not clear and convincing evidence of the following:

> a) That there is little likelihood that Petitioner will be a future perpetrator of child abuse or neglect. To the contrary, Petitioner's history of Bi-Polar — Type II, and no proof that she has it under control, coupled with her statement that she had been released from therapy two months prior to the incident is troubling.

> b) That there is current probative value to justify the retention of the substantiation in the records as there is possibility of Petitioner working with children during their most vulnerable time.

Appellant's App. Vol II, pp. 31-33.

[15] The evidence in this case showed that this occurrence of neglect was an isolated incident that occurred eight years ago at the end of a bitter divorce. Strohbach's conduct was not directed at her son nor was her son struck or involved in any way other than to witness the altercation between his mom and his dad's girlfriend. Strohbach readily admits that she exercised poor judgment in taking her son with her to address her concerns with her ex-husband. However, she accepted responsibility for her actions, both criminally and with the juvenile court/DCS, and complied with all court orders and services. Moreover, Strohbach has had no involvement with either DCS, the juvenile court, or the criminal court since that incident.

[16] Further, in addition to her own testimony, Strohbach presented the testimony of three witnesses as to her conduct with children. The uncontroverted evidence shows that Strohbach's interaction with children has been that of a caring, loving adult with whom people aware of the neglect substantiation would not be fearful of leaving their children. In addition, although DCS did not agree to Strohbach's request for expungement, it clearly informed the trial court that it was not opposing expungement.

[17] In its findings, the trial court focused on a note contained in a 2010 or 2011 DCS report regarding a diagnosis of bipolar disorder.[2] The court questioned Strohbach about the diagnosis, and she candidly explained that the symptoms had manifested themselves as a result of her abusive, dysfunctional marriage. She stated that she was treated with medications and mental health services and that once she was separated from her husband, the symptoms began to subside. Under her doctor's care, she was later weaned off the medications and released from treatment. She added that she had been medication free for several years and had experienced no further problems. The court noted in its findings that Strohbach had taken her medications as prescribed and that she had been released from therapy in August 2010. The court further noted it appeared that Strohbach's ex-husband had abused Strohbach during the marriage.

---

[2] This report, although referred to by the court, was not made part of the record.

[18]     Yet, in light of the evidence and the court's own findings, the court nonetheless stated in another finding that Strohbach "provided no evidence that she is addressing" her bipolar disorder, that she "claimed" she was dismissed from therapy prior to the incident but that she provided no proof other than her testimony that she was released, and that she "claims that the doctor weaned her off her meds and closed her case." *Id.* at 32-33. The court then determined that Strohbach's "history" of bipolar disorder was a sufficient basis to find that she had not met her burden, stating that there was "no proof that [Strohbach] has it under control" and it was troubled by the fact that "she had been released from therapy two months prior to the incident." *Id.* at 33.

[19]     Notably, the court made no findings that the testimony of Strohbach, or any of her witnesses, was not credible. In addition, DCS obviously knew about Strohbach's previous diagnosis, treatment, and release and yet it did not oppose her expungement request. Moreover, there was no evidence of a professional nature explaining Strohbach's condition or associating it in any way with the incident. On the contrary, the evidence shows that Strohbach's reaction at her ex-husband's apartment in 2010 followed her ex-husband grabbing her by the arms and his girlfriend slamming a door in her face. Strohbach testified, and it was apparently somewhat documented in the DCS report, that her marriage was an abusive, dysfunctional relationship. In response to questioning by the court, Strohbach testified, "my ex-husband put his hands on me which had been a recurring theme in our marriage, that he was physically—he was a bully. A physical bully. Um, so I broke away from him and I ran down the hallway to

call his girlfriend out [of the bedroom] because I wanted number one to talk to her, I wanted her in my physical presence cuz I thought if she was there he would stop being aggressive towards me. When I got to the bedroom she slammed the door on me, it hit me in the face, and then I just—my defense mechanism kicked in." Tr. p. 28.

[20] The trial court was presented with no evidence that Strohbach's actions were caused by or related in any way to a bipolar disorder; therefore, the speculative concerns of the trial court regarding any bipolar condition that might have existed in the past do not support the court's determination. Thus, in light of the anomalous nature of this incident as well as the unequivocal and uncontroverted testimony of Strohbach and her three witnesses, we conclude that Strohbach has made a prima facie showing that there was clear and convincing evidence that there is little likelihood Strohbach will be a future perpetrator of child abuse or neglect. Moreover, because we conclude thus, there is no present reason for maintaining the record of the neglect substantiation.

## Conclusion

[21] For the foregoing reasons, we conclude that Strohbach has made a prima facie showing of reversible error.

[22] Reversed and remanded with instructions to the court to grant Strohbach's petition and to order expungement of her neglect substantiation.

Mathias, J., and Crone, J., concur.